UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | **EDCV 17-2489 JGB (KKx)** | Date | May 29, 2019 |
| Title | *Carlos Moreno v. JCT Logistics, Inc., et al.* | | |

Present: The Honorable    JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:    Order GRANTING IN PART Plaintiff's Motion for Class Certification (Dkt. No. 41) (IN CHAMBERS)**

Before the Court is Plaintiff Carlos Moreno's Motion for Class Certification. ("Motion," Dkt. No. 41.) The Court held a hearing on the matter on January 28, 2019. After considering the oral arguments and papers filed in support of and in opposition to the Motion, the Court GRANTS IN PART the Motion.

## I.   BACKGROUND

### A.  Procedural Background

Plaintiff Carlos Moreno ("Plaintiff") originally filed this action in the Superior Court of the State of California, County of San Bernardino, as a class action for wage and hour violations arising out of Defendants John Christner Trucking, LLC and John Christner Trucking, Inc.'s ("Defendants" or "JCT") alleged misclassification of truck drivers as independent contractors. (See First Amended Complaint ("FAC"), Dkt. No 3-1 at 2.) The FAC contained seven causes of action: 1) failure to provide meal period; 2) failure to provide rest breaks; 3) failure to pay minimum wages; 4) failure to furnish timely and accurate wage statements; 5) failure to pay all wages owed every pay period; 6) failure to reimburse business expenses; and 7) violation of California's Unfair Competition Act ("UCL"), Bus. & Prof. Code § 17200 et seq. (Id. at 1.) Defendants removed the action to this Court on December 12, 2017. (See Notice of Removal, Dkt. No. 3.)

On January 12, 2018, Plaintiff filed a Motion to Remand Case to San Bernardino Superior Court. ("Motion to Remand," Dkt. No. 20.) On February 5, 2018, Defendants filed a Motion to Transfer Case to the Northern District of Oklahoma. ("Motion to Transfer," Dkt. No. 21.) The Court issued an order denying Plaintiff's Motion to Remand and Defendants' Motion to Transfer on March 21, 2018. ("MTR/MTT Order," Dkt. No. 35.) On November 19, 2018, Defendants filed a motion for summary judgment. ("MSJ," Dkt. No. 45.) The Court issued an order denying Defendants' MSJ on January 8, 2019. (Dkt. No. 55.)

On October 31, 2018, Plaintiff filed the instant Motion, accompanied by the declaration of Carlos Moreno ("Moreno Decl.," Dkt. No. 41-1) and the declaration of Joshua Haffner ("Haffner Decl.," Dkt. No 41-2). The Haffner Declaration introduces a number of Exhibits, including the Broker-Carrier Agreement signed by Plaintiff ("BCA," Dkt. No 41-2 at 8–9[1]); a transcript of the deposition of Shannon Crowley, Defendants' person most qualified to testify under FRCP 30(b)(6) ("Crowley Depo," Dkt. No. 41-2 at 35–96); and a transcript of the deposition of Ghulam Nabi Yousuf, a JCT employee who brokers the company's intrastate loads ("Yousuf Depo," Dkt. No. 41-2 at 97–137). On December 3, 2018, Defendants filed an opposition to the Motion. ("Opp.," Dkt. No. 46.) On December 19, 2018, Plaintiff filed a reply in support of the Motion ("Reply," Dkt. No. 49), along with additional pages from the transcript of the deposition of Mr. Yousuf ("Yousuf Depo II," Dkt. No. 49-1 at 3–10).

On January 4, 2019, the parties stipulated to file supplemental briefs to address newly discovered evidence. ("Stipulation to Modify Briefing Schedule" or "Mod Stip," Dkt. No. 52 ¶ 5; see also "Order Granting Stipulation," Dkt. No. 56.) On January 7, 2019, Defendants filed their supplemental brief ("Defendants' 1st Supplemental Brief" or "D. Supp. 1," Dkt. No. 53.) On January 14, 2019, Plaintiff filed his response to Defendants' 1st Supplemental Brief. ("Plaintiff's 1st Supplemental Brief" or "P. Supp. 1," Dkt. No. 57.)

The Court held a hearing on January 28, 2019. After considering the parties' arguments, the Court ordered supplemental briefing on the following questions:

1) Under California law, what analysis applies to determine, for the purposes of the California Industrial Welfare Commission's (IWC) Wage Orders, whether JCT employs the drivers hired by the contract carriers with which JCT contracts? If JCT is a joint employer of those drivers, how does that affect the Court's analysis of commonality, typicality, and predominance under Federal Rule of Civil Procedure 23 ("Rule 23")?

2) Is it necessary, for the purposes of the analysis under Rule 23, for Plaintiff to establish that drivers hired by contract carriers suffered harm as a result of being subjected to

---

[1] Here, because Dkt. Nos. 41-2 and 49-1 include multiple documents with distinct pagination, the Court refers to the page numbers contained in the heading generated by the Electronic Case File ("ECF") system. Hereinafter, when citing documents within Dkt. Nos. 41-2 or 49-1, the Court will refer to the page numbers of the specific document.

---

the same policies as drivers who contracted directly with JCT?  If not, do Defendants bear the burden of showing that drivers hired by contract carriers were subject to different policies?  To the extent possible, cite federal authority.

3) If the requirements of Rule 23 are not satisfied as to the entire class, will limiting the class to the proposed subclass of drivers who made a single truck available cure the deficiencies?  If not, what alternate definition of the subclass would satisfy the requirements of Rule 23?

("Supp. Brief Order," Dkt. No 58.)  On February 8, 2019, Plaintiff filed his supplemental brief.  ("Plaintiff's 2nd Supplemental Brief" or "P. Supp. 2," Dkt. No. 60.)  On February 15, 2019, Defendants filed their response to Plaintiff's 2nd Supplemental Brief.  ("Defendants' 2nd Supplemental Brief" or "D. Supp. 2," Dkt. No. 61.)

**B.  Factual Background[2]**

Motor carriers are "companies that transport freight for-hire[.]"  (Defendants' MSJ Memo, Dkt. No. 45-1 at 2, citing 49 U.S.C. §§ 13901, 13902.)  Individuals may also operate as federally-authorized motor carriers.  (Id. at 2–3, citing 49 U.S.C. § 13901(a); 1 U.S.C. § 1.)  Property brokers (or freight brokers) are companies that "arrange for delivery of freight in interstate commerce" by authorized motor carriers.  (Id. at 3.)  "Federal law permits a company to hold both motor carrier and property broker authority."  (Id.)

JCT is a transportation and logistics company with both federal motor carrier authority and property broker authority.  (Defendants' Statement of Undisputed Facts" or "DSUF," Dkt. No. 45–2 ¶¶ 1, 2.)  According to JCT, its trucking division transports freight under JCT's own motor carrier authority (id. ¶ 3), while its logistics division ("JCT Logistics") "enters into contracts with shippers to arrange for the transportation of freight by authorized for-hire motor carriers under JCT's property broker authority."  (Id. ¶¶ 4, 5.)  The contracts between JCT Logistics and motor carriers[3] are called "Broker-Carrier Agreements" ("BCA").  (Id. ¶ 7; Motion at 11.)  The carriers with which JCT contracts are classified as independent contractors.  (Motion at 11 (citing Crowley Depo. at 17:4–6; Amended Notice of Removal, Dkt. No 13-1 at 4:25-27).)

"Each Contract Carrier completes a 'Carrier Profile' worksheet that indicates the number of trucks the Contract Carrier intends to make available."  (Opp. at 3; see also Motion at

---

[2] The following facts are drawn from the papers submitted by the parties relating to Defendants' MSJ as well as the papers relating to the instant Motion.

[3] JCT refers to the motor carriers with which its logistic division contracts as "Contract Carriers." (DSUF ¶ 8; Motion at 11.)

11.)  Some carriers make a single truck available, while others have multiple trucks.[4]  (Opp. at 3.) Approximately 30 to 40% of the carriers JCT hired have only one truck.  (Motion at 17 (citing Crowley Depo at 82:8 -83:2).)  "Nearly all contract carriers with one truck are driven by the owners."  (Id. at 18 (citing Yousuf Depo at 21:22–22).)

Plaintiff became a federally-authorized motor carrier in 2009, when he started Brown & Cross Trucking.  (DSUF ¶ 19.)  JCT and Brown & Cross Trucking entered into a Broker-Carrier Agreement in April 2017 (id. ¶ 29; BCA at 1), after which Plaintiff began driving loads for JCT. Plaintiff made only one truck available for driving loads for JCT.  (Opp. at 3.)

## II.  LEGAL STANDARD

### A.  Class Certification

Federal Rule of Civil Procedure 23 ("Rule 23") governs the litigation of class actions.  A party seeking class certification must establish the following prerequisites:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  After satisfying the four prerequisites of numerosity, commonality, typicality, and adequacy, a party must also demonstrate one of the following: (1) a risk that separate actions would create incompatible standards of conduct for the defendant or prejudice individual class members not parties to the action; (2) the defendant has treated the members of the class as a class, making appropriate injunctive or declaratory relief with respect to the class as a whole; or (3) common questions of law or fact predominate over questions affecting individual members and that a class action is a superior method for fairly and efficiently adjudicating the action.  See Fed. R. Civ. P. 23(b)(1)-(3).[5]

A trial court has broad discretion regarding whether to grant a motion for class certification.  See Bateman v. Am. Multi-Cinema, Inc., 623 F.3d 708, 712 (9th Cir. 2010). However, "[a] party seeking class certification must affirmatively demonstrate compliance with [Rule 23]—that is, the party must be prepared to prove that there are *in fact* sufficiently

---

[4] Defendants note that some carriers "reported one truck but, over time, used multiple trucks to haul loads brokered by JCT."  (Opp. at 3.)

[5] While some circuits have adopted an "ascertainability" prerequisite to certification, the Ninth Circuit has not.  Briseno v. ConAgra Foods, Inc., 844 F.3d 1121, 1124 n.4 (9th Cir. 2017) ("ConAgra cites no other precedent to support the notion that our court has adopted an 'ascertainability' requirement.  This is not surprising because we have not.  Instead, we have addressed the types of alleged definitional deficiencies other courts have referred to as 'ascertainability' issues . . . through analysis of Rule 23's enumerated requirements.").

**CIVIL MINUTES—GENERAL**  Initials of Deputy Clerk:  <u>MG</u>

numerous parties, common questions of law or fact, etc." <u>Wal-Mart Stores, Inc. v. Dukes</u>, 564 U.S. 338, 350 (2011). A district court must conduct a "rigorous analysis" that frequently "will entail some overlap with the merits of the plaintiff's underlying claim." <u>Id.</u> at 351. "Courts typically proceed claim-by-claim in determining whether the Rule 23 requirements have been met, particularly as to the Rule 23(a)(2) and (b)(3) requirements of common questions and predominance." <u>Allen v. Verizon California, Inc.</u>, 2010 WL 11583099, at *2 (C.D. Cal. Aug. 12, 2010).

Rule 23 further provides that "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues," Fed. R. Civ. P. 23(c)(4), or the "class may be divided into subclasses that are each treated as a class under this rule," Fed. R. Civ. P. 23(c)(5). "This means that each subclass must independently meet the requirements of Rule 23 for the maintenance of a class action." <u>Betts v. Reliable Collection Agency, Ltd.</u>, 659 F.2d 1000, 1005 (9th Cir. 1981).

## B. California's Employment Tests

The California Supreme Court articulated the general common law test for determining whether an employment relationship exists for the purposes of California labor law in <u>S. G. Borello & Sons, Inc. v. Dep't of Indus. Relations</u>, 48 Cal. 3d 341 (1989). Under <u>Borello</u>, "[t]he principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired[.]" <u>Id.</u> at 350 (internal quotation marks omitted). In applying the <u>Borello</u> test, courts also consider the following secondary factors:

> (a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee.

<u>Id.</u> at 351.

Claims governed by California's Industrial Welfare Commission's (IWC) definition of employment, however, are subject to a broader standard, which "incorporates the common law definition *as one alternative.*" <u>Martinez v. Combs</u>, 49 Cal. 4th 35, 64 (2010), <u>as modified</u> (June 9, 2010). In <u>Martinez</u>, the California Supreme Court held that the IWC's definition of "to employ" included three alternative definitions: "(a) to exercise control over the wages, hours or working conditions, *or* (b) to suffer or permit to work, *or* (c) to engage, thereby creating a

common law employment relationship." Id.  As to the first definition, the court noted that it "encompasses 'any person . . . who directly or indirectly, or through an agent or any other person, employs or exercises control over the wages, hours, or working conditions of any person[.]'"  Id. at 71 (quoting Wage Order No. 14 (Cal. Code Regs., Tit. 8, § 11140, subd. 2(F)).[6]

With regard to the "suffer or permit to work" prong, the court elaborated that "the basis of liability is the defendant's knowledge of and *failure to prevent* the work from occurring."  Id. at 70.  It concluded that the defendants had not "suffered or permitted plaintiffs to work because neither had the power to prevent plaintiffs from working."  Id.  Specifically, it considered the defendants' lack of control over hiring and firing decisions, setting wages and hours, and determining when and where workers would report to work.[7]  Id.  The court did not elaborate on the third definition, as the plaintiffs advanced arguments under only the first two definitions.  See id. at 68.  The court declined to decide whether the Borello test had any relevance to wage claims.  Id. at 73.

In Dynamex Operations W. v. Superior Court, the California Supreme Court adopted a test known as the "ABC test" for interpreting the "suffer or permit to work" prong of the IWC's definition of employ.  4 Cal. 5th 903, 956–57 (2018), reh'g denied (June 20, 2018).  Under that test, the hiring entity bears the burden of establishing that a worker is an independent

---

[6] Despite this broad definition, the Martinez court concluded that "plaintiffs' factual assertions do not establish that [defendant produce merchant's] business relationship with [strawberry farming operation owned by] Munoz allowed [defendant] to exercise control over Munoz's employees' wages and hours" for four reasons: 1) "Munoz paid his employees out of th[e] combined revenues and assets" of his "single, integrated business operation, growing and harvesting strawberries for several unrelated merchants and combining revenue from all sources with a personal investment[;]" 2) "Munoz had losses unrelated to his business with [defendant] from his unsuccessful business with" another produce merchant; 3) "Munoz had substantial revenue from other sources" on the dates in question; and 4) "Munoz alone, with the assistance of his foremen, hired and fired plaintiffs, trained and supervised them, determined their rate and manner of pay (hourly or piece rate), and set their hours, telling them when and where to report to work and when to take breaks."  Martinez, 49 Cal. 4th at 72.

[7] The Martinez court further stated that

Perhaps [the defendant produce merchants], by ceasing to buy strawberries [from strawberry farming operation owned by Munoz], might as a practical matter have forced Munoz to lay off workers or to divert their labor to other projects . . . .  But any substantial purchaser of commodities might force similar choices on a supplier by withdrawing its business.  Such a business relationship, standing alone, does not transform the purchaser into the employer of the supplier's workforce.

49 Cal. 4th at 70.

**CIVIL MINUTES—GENERAL**   Initials of Deputy Clerk:  MG

contractor rather than an employee. Id. at 957. In order to meet that burden, it must establish each of the test's three factors:

> (A) that the worker is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact; *and* (B) that the worker performs work that is outside the usual course of the hiring entity's business; *and* (C) that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed.

Id. Thus, if the putative employer fails to establish any one of the three prongs with regard to a worker, the worker is properly classified as an employee for the purposes of IWC wage orders.

## III.   DISCUSSION

Here, Plaintiff proposes a class defined as follows: "All current and former California residents who drove for Defendant John Christner Trucking, LLC ('Defendant' or 'JCT') intra-state pursuant to a contract-carrier agreement at any time from July 6, 2013 through the date notice is mailed to the Class." (Motion at 2.)

In the Motion, Plaintiff also proposed a sub-class defined as follows: "All current and former California residents who drove for Defendant intra-state pursuant to a contract-carrier agreement where one truck was made available to JCT, at any time from July 6, 2013 through the date notice is mailed to the Class." (Id. (emphasis added).)

In Plaintiff's 2nd Supplemental Brief, he proposed an alternative sub-class defined as follows: "All current and former California residents who drove for Defendant intra-state at any time from July 6, 2013 through the date notice is mailed to the Class, and who executed a Broker/Carrier Agreement or similar written contract on behalf of themselves or entities in which they have an ownership interest." (P. Supp. 2 at 10 (emphasis added).)[8]

### A.   Rule 23(a) Requirements

#### 1.   Numerosity

A class satisfies the prerequisite of numerosity if it is so large that joinder of all class members is impracticable. Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir. 1998). To be impracticable, joinder must be difficult or inconvenient but need not be impossible. Keegan v. American Honda Motor Co., 284 F.R.D. 504, 522 (C.D. Cal. 2012). There is no numerical cutoff for sufficient numerosity. Id. However, forty or more members will generally satisfy the numerosity requirement. Id. According to Plaintiffs, "Mr. Yous[u]f estimated there were

---

[8] Hereinafter, any mention by the Court of the "subclass" refers to the subclass as defined in Plaintiff's 2nd Supplemental Brief.

currently approximately 100 contract-carriers doing intrastate jobs for JCT in California, of which 75 are single truck operators." (Motion at 17 (citing Yousuf Depo at 33:21-34:7, 44:18-25).) Defendants do not argue that the numerosity requirement is not satisfied here. The Court therefore finds that the class is sufficiently numerous that joinder of all class members would be impracticable.

## 2. Commonality

The commonality requirement is satisfied when plaintiffs assert claims that "depend upon a common contention . . . capable of classwide resolution—which means that a determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Wal-Mart, 564 U.S. at 350; see also id. ("What matters to class certification . . . is not the raising of common questions . . . but, rather, the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation.") (internal quotation marks and citations omitted). Differences among putative class members can impede the generation of such common answers. Id. In the Ninth Circuit, "Rule 23(a)(2) has been construed permissively. . . . The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." Staton v. Boeing Co., 327 F.3d 938, 953 (9th Cir. 2003).

Plaintiff contends that "the underlying issue common to all Plaintiff['s] and the Class['] claims is whether the drivers were misclassified as independent contractors." (Motion at 19.) Defendants state Plaintiff's purported common issue in more specific terms: "whether the putative class members were employees or independent contractors under the B prong of the ABC test announced in *Dynamex*[.]"[9] (Opp. at 9.) They argue that this issue "is not common at all because it does not even apply to the entire class or even all the claims." (Id.) Specifically, they argue that 1) drivers hired by carriers must satisfy a different standard applicable when the defendant is alleged to be a joint employer and 2) "each individual class member's misclassification claim will be subject to a different test [i.e., the ABC test or the Borello test] depending on the substantive claim being asserted." (Id. at 9–10.)

### a. Joint Employment

In support of their first argument, Defendants cite a California Court of Appeal case, Curry v. Equilon Enterprises, LLC, for the proposition that "the California Supreme Court in *Dynamex* did not call for the ABC test to apply in joint-employment cases." (Opp. at 9 (citing 23

---

[9] Plaintiff also argues that the "to exercise control over the wages, hours or working conditions" prong of the IWC's definition of employment may provide an alternative basis to find misclassification. (Motion at 22 (quoting Dynamex, 4 Cal. 5th at 915-16)). Plaintiff elaborates on the applicability of the alternative employment tests in his 2nd Supplemental Brief. (See P. Supp. 2 at 2–3.) Because the Court determines that the applicability of one common test is sufficient to satisfy commonality, it does not discuss those alternative tests here. The Court addresses which tests apply and whether common issues predominate their analyses infra.

Cal. App. 5th 289, 314 (2018) as modified on denial of reh'g (May 18, 2018), review denied (July 11, 2018).)  In their 2nd Supplemental Brief, Defendants state that the Curry court "applied the same framework used in Martinez – specifically, it concluded [the defendant] did not employ the plaintiff because it lacked the power to prevent the plaintiff from working."  (D. Supp. 2 at 2 (citing Curry, 23 Cal. App. 5th at 310–12).)  According to Defendants, the Court of Appeal "conclude[ed] the ABC test did not apply outside the independent contractor context."  (Id. (citing Curry, 23 Cal. App. 5th at 313–14).)

Plaintiff counters that the Curry court's "comments regarding the 'suffer or permit to work' definition were . . . non-binding dicta" because the court merely "suggested that there may be an alternative standard for 'suffer or permit to work' in the joint employment context, [but] it did not decide that issue, and ultimately evaluated the merits of the joint employment claim under the ABC test."  (P. Supp. 2 at 4 (citing Curry, 23 Cal. App. 5th at 314).)  The Court agrees that Curry did not conclusively hold that the ABC test does not apply in the joint employment context.  Though the Curry court stated that "it does not appear that the Supreme Court intended for the 'ABC' test to be applied in joint employment cases," it applied both Martinez and Dynamex and concluded that the plaintiff's claims failed under either standard. See 23 Cal. App. 5th at 310–12, 314–16.

Further, the Court is not convinced the logic of Curry applies here.  The Curry court's doubts about the applicability of Dynamex to joint employment cases were based on its determination that the policy reasons behind the Dynamex decision – to prevent employers from misclassifying workers as independent contractors – were inapplicable in the joint employment context.  Curry, 23 Cal. App. 5th at 314.  The court reasoned that in joint employment cases, "the alleged employee is already considered an employee of the primary employer" and is "afforded legal protections due to being an employee of the primary employer."  Id.  Here, it is unclear how the drivers hired by carriers were classified, and there is no indication they have been afforded the legal protections due to employees.  Consequently, the Court is not persuaded that the Curry court's reasoning is relevant to the circumstances of this case.

Moreover, Martinez, upon which the Dynamex court relied, applied the "suffer or permit to work" prong of the IWC's definition of employment in the joint employment context, explaining that "[a] proprietor who knows that persons are working in his or her business without having been formally hired, or while being paid less than the minimum wage, clearly suffers or permits that work by failing to prevent it, while having the power to do so."  Martinez, 49 Cal. 4th at 68.  The Dynamex court later adopted the ABC test to interpret the "suffer or permit to work" standard.  4 Cal. 5th at 956–57.  As Plaintiff points out, "*Dynamex* held that the ABC test applied to the 'suffer or permit to work' definition as to '*all* workers.'"  (P. Supp. 2 at 4 (quoting Dynamex, 4 Cal. 5th at 916 (italics in original)).)  Though Dynamex did not involve allegations of joint employment, it in no way limited its holding to exclude the circumstances of Martinez.

Defendants raise the additional argument that "in *Dynamex*, the California Supreme Court repeatedly referred to the *hiring entity*."  (D. Supp. 2 at 2 n. 1 (citing Dynamex, 416 P.3d at 35).)  This language gives the Court pause in applying the ABC test to drivers hired by contract

---

carriers, rather than hired directly by Defendants. However, considering the broad language in Dynamex[10] and the fact that, though it drew extensively on Martinez, it did not distinguish the circumstances of that case as ones in which the ABC test did not apply, the Court determines that the ABC test is equally applicable to drivers who contracted directly with Defendants and drivers hired by carriers who contracted with Defendants.[11]

### b. Applicability of Different Tests to Different Claims

As to their second argument, Defendants posit that the ABC test applies only to claims brought under IWC wage orders, while the Borello test applies to claims under the California Labor Code. (Opp. at 10.) They argue that, [b]ecause Moreno's proposed class claims involve different tests for misclassification, Moreno has failed to demonstrate commonality." (Id. (citing Echavarria, 2016 WL 1047225, at * 12).) The Court sees no reason why the applicability of different tests to different claims would defeat commonality, as long as those tests apply equally to all class members. Defendants' argument is undermined by a Northern District of California

---

[10] The Dynamex court used the following language in adopting the ABC test:

> We find merit in the concerns noted above regarding the disadvantages, particularly in the wage and hour context, inherent in relying upon a multifactor, all the circumstances standard for distinguishing between employees and independent contractors. As a consequence, we conclude it is appropriate, and most consistent with the history and purpose of the suffer or permit to work standard in California's wage orders, to interpret that standard as [the ABC test].

Dynamex, 4 Cal. 5th at 956-57.

[11] The Ninth Circuit's recent discussion in Vazquez v. Jan-Pro Franchising Int'l, Inc., 2019 WL 1945001 (9th Cir. May 2, 2019), of whether the ABC test applies in the franchise context also provides support for the Court's conclusion that the ABC test applies to drivers who do not have a contract with JCT. There, the court discussed a decision by the Supreme Judicial Court of Massachusetts ("SJC"), Depianti v. Jan-Pro Franchising Int'l, Inc., 465 Mass. 607 (2013). Massachusetts case law is persuasive because "Dynamex embraced the Massachusetts version of the [ABC] test." Vazquez, 2019 WL 1945001, at *14. In Depianti, the SJC determined that "the ABC test applies to a dispute between a putative employee and a hiring entity even if they are not parties to the same contract." Vazquez, 2019 WL 1945001, at *16. The SJC discussed an example in which "'[C]ompany A contracts with company B for services, and company B enters into arrangements with third parties to perform the work it undertook under its contract with company A.'" Id. at *17 (quoting Depianti, 465 Mass. at 624). The SJC indicated that "'the lack of contract between [Company A and workers hired by Company B] does not itself preclude liability [because] [w]here a party is the agent of misclassification, it may be directly liable under [the ABC test], even where it utilizes a proxy to make arrangements with its employees.'" Id. (quoting Depianti, 465 Mass. at 624). Based on Depianti, the Ninth Circuit concluded that, "as a doctrinal matter, [the defendant] could be Plaintiffs' employer under the ABC test even though it is not a party to any contract with Plaintiffs." Id.

---

decision, Johnson v. Serenity Transportation, Inc., No. 15-CV-02004-JSC, 2018 WL 3646540 (N.D. Cal. Aug. 1, 2018). In that case, the court determined that the commonality requirement was satisfied "because whether [the defendant] misclassified its drivers as independent contractors rather than employees under California law is a common question underlying every cause of action that is capable of common resolution for the class." Id. at *8. This was so even though both the Borello and ABC test were potentially applicable. Id. at *11 ("In sum, common questions predominate the misclassification issue under the *Borello*, and, [to] the extent applicable, ABC test.").

Courts have frequently found the commonality requirement satisfied based on the common issue of whether class members were misclassified as independent contractors instead of employees. See, e.g., Johnson, 2018 WL 3646540, at *8; Soares v. Flowers Foods, Inc., 320 F.R.D. 464, 477 (N.D. Cal. 2017) ("Plaintiffs satisfy the commonality requirement because whether Defendants misclassified its distributors as independent contractors under California law is a common question that is capable of common resolution for the class based on the Distributor Agreements that all putative class members signed."); Alfred v. Pepperidge Farm, Inc., 322 F.R.D. 519, 538-39 (C.D. Cal. 2017) ("There is a common question presented in this action. It is whether the SDAs are independent contractors or employees of Defendant."); Bowerman v. Field Asset Servs., Inc., No. 13-CV-00057-WHO, 2015 WL 1321883, at *14 (N.D. Cal. Mar. 24, 2015) ("Commonality is satisfied here. The key legal issue underlying this case is whether putative class members were misclassified under California law as independent contractors instead of employees. . . . [T]his is a common question that is capable of a common resolution for the class."). Likewise, here, Plaintiff has presented a common question. Because the Court finds that at least one employment test applies to both drivers who contracted directly with Defendants and drivers hired by carriers, that question is capable of resolution on a class-wide basis. The commonality requirement is therefore satisfied.

### 3. Typicality

"The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992). The typicality inquiry focuses on the claims, not the specific facts underlying them. Just Film, Inc. v. Buono, 847 F.3d 1108, 1116 (9th Cir. 2017). "The requirement is permissive, such that 'representative claims are typical if they are reasonably coextensive with those of absent class members; they need not be substantially identical.'" Id. (quoting Parsons v. Ryan, 754 F.3d 657, 685 (9th Cir. 2014)). "Measures of typicality include whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." Id. (internal quotations and citations omitted). The applicability of different defenses to the class representative will preclude typicality if "there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." Id. (quoting Hanon, 976 F.2d at 508).

Here, Plaintiff argues the typicality requirement is met because his "claims arise out of the same contractual arrangement, pay plans, policies and procedures, and involve the same conduct by JCT and same legal theories." (Motion at 20.)  Defendants argue Moreno is not typical of the class because "he operated as a single-truck motor carrier and . . . drove his own truck[, while] [o]ther Contract Carriers hired drivers and operated multiple trucks."  (Opp. at 13.)  Because multi-truck carriers may have applied their own policies to drivers they hired, Defendants argue "Moreno cannot fairly represent class members" subject to these different policies.  (Id. at 13–14.)  Plaintiff counters that he "has proffered evidence that Defendant paid Plaintiff and the Class on a piece-rate, per-load system," under which "Plaintiff and the Class were uniformly not compensated for non-productive and rest break time[.]"  (Reply at 14.)  Plaintiff also argues that Defendants' failure to define a meal and rest break policy and failure to schedule meal breaks "apply equally across the Class and Subclass."  (Id.)  Finally, Plaintiff asserts he "and the Subclass each incurred the same unreimbursed costs for fuel and insurance."  (Id.)[12]  Based on the foregoing, the Court finds Plaintiff has provided evidence that "the action is based on conduct which is not unique to the named plaintiff[.]"  See Just Film, 847 F.3d at 1116.

In their 2nd Supplemental Brief, Defendants contend that, "[w]ithout evidence of the policies he alleges have a common effect on *all* individuals in his proposed class, Plaintiff cannot meet Rule 23's requirement[] of . . . typicality."  (D. Supp. 2 at 6.)  The Supreme Court has held that "[a] party seeking class certification must . . . be prepared to prove" he satisfies the requirements of Rule 23, Wal-Mart, 564 U.S. at 350, and the Ninth Circuit has indicated that, in assessing typicality, courts should consider "whether other members have the same or similar injury" and "whether other class members have been injured by the same course of conduct," Just Film, 847 F.3d at 1116.  Combined, this precedent could be interpreted to require plaintiffs to prove at the class certification stage that all class members were injured by the defendant's conduct.  Here, Plaintiff would face the hurdle of proving the drivers hired by carriers were not subject to any separate employment policies.  However, the Ninth Circuit has indicated that "[t]he requirement of typicality is not primarily concerned with whether each person in a proposed class suffers the same type of damages; rather, it is sufficient for typicality if the plaintiff endured a course of conduct directed against the class."  Just Film, 847 F.3d at 1118.

Moreover, the Ninth Circuit's post-Wal-Mart decisions have not required proof of injury to establish typicality; rather, they have found typicality to be met on the basis of the plaintiff's allegations.  See Just Film, 847 F.3d at 1117 ("Campbell's claim is reasonably coextensive with that of the class because she alleges Leasing Defendants committed the *same* overall course of misconduct against other members of the class . . . and the class's alleged injuries also resulted

---

[12] In Plaintiff's 2nd Supplemental Brief, he argues that he need not establish that all class members were injured by Defendant's conduct.  (P. Supp. 2 at 6.)  Plaintiff relies primarily on a Fifth Circuit decision, Mims v. Stewart Title Guar. Co., 590 F.3d 298, 308 (5th Cir. 2009).  (Id.)  Plaintiff cites Mims as a Ninth Circuit decision.  (See P. Supp. 2 at 6:18, 22.)  The Court, assuming Plaintiff would not knowingly misrepresent that binding authority exists when it does not, urges him to exercise greater care in drafting future briefs.

**CIVIL MINUTES—GENERAL**              Initials of Deputy Clerk: MG

from that course of misconduct."); <u>Parsons v. Ryan</u>, 754 F.3d 657, 685 (9th Cir. 2014) ("The named plaintiffs thus allege 'the same or [a] similar injury' as the rest of the putative class; they allege that this injury is a result of a course of conduct that is not unique to any of them; and they allege that the injury follows from the course of conduct at the center of the class claims."); <u>see also</u> <u>Wright v. Renzenberger, Inc.</u>, 656 F. App'x 835, 839-40 (9th Cir. 2016) (unpublished) ("[W]hether a named plaintiff actually suffered injury is irrelevant; what matters is whether the plaintiff has alleged the same type of injury as other plaintiffs.")[13] Here, Plaintiff has alleged that all class members suffered the same or similar injury as a result of the same course of conduct by Defendants.  (<u>See</u> FAC ¶¶ 13–21.)

Defendants also argue "Moreno is not typical of the class he seeks to represent because his claims raise defenses that are not common to the class" in that he operated as a single-truck motor carrier, while other class members were hired by carriers.  (Opp. at 13.)  However, "the typicality requirement focuses on . . . whether *the named plaintiffs* are subject to unique defenses[.]"  <u>In re ConAgra Foods, Inc.</u>, 90 F. Supp. 3d 919, 975 (C.D. Cal. 2015).  Here, Defendants' argument that drivers hired by carriers could have been subject to different employment policies may present an additional defense with regard those drivers.  It does not provide any additional defense against Moreno's claims, and certainly does not create a "danger that absent class members will suffer [because] their representative is preoccupied with defenses unique to [him]."  <u>See</u> <u>Just Film</u>, 847 F.3d at 1116.  For the foregoing reasons, Plaintiff has made the affirmative showing necessary to satisfy the typicality requirement.

### 4.  Adequacy

In determining whether a proposed class representative will adequately protect the interests of the class, the court asks whether the proposed class representative and his counsel have any conflicts of interest with any class members and whether the proposed class

---

[13] Allegations of common injury may be insufficient to satisfy typicality when there is evidence repudiating those allegations.  <u>Compare</u> <u>Munoz v. Giumarra Vineyards Corp.</u>, 2012 WL 2617553, at *20 (E.D. Cal. July 5, 2012), <u>report and recommendation adopted</u>, 2013 WL 2421599 (E.D. Cal. June 3, 2013) ("Plaintiffs contend they were 'subject to the same practices of the Defendant' as the putative class members, and the 'non-compliant meal policy applied to all fieldworkers, including the class representatives.'  As a result, Plaintiffs have a 'same or similar injury' as putative class members.  Accordingly, Plaintiffs have demonstrated that the typicality requirement is satisfied.") (internal citations omitted), <u>with</u> <u>id.</u> at *29 ("Although Plaintiffs and putative class members were employed by Defendant and should have been subject to the same policies and procedures, declarants provide differing accounts of what *actually* was required by the differing practices of its foremen.  Plaintiffs do not appear 'to have the same or similar injury' as many of the putative class members who assert off-the-clock work was neither required nor permitted by Defendant.  Therefore, Plaintiffs are unable to demonstrate typicality of claims with members of the proposed class.").  Here, as Plaintiff points out, "Defendant provides no evidence that any contract carrier actually complies with California law vis-à-vis the violations at issue."  (P. Supp. 2 at 8.)

---

representative and his counsel will prosecute the action vigorously on behalf of the class. Johnson v. General Mills, Inc., 275 F.R.D. 282, 288 (C.D. Cal. 2011).

Here, Plaintiff highlights the proposed class counsel's experience with class action litigation and asserts that Moreno will fairly and adequately protect the interests of class members. (Motion at 20 (citing Haffner Decl. ¶¶ 22–26; Moreno Decl. ¶ 8).) Defendants argue that "Moreno's counsel has conflicts within the putative class because they seek to represent both Contract Carriers and the drivers that worked for the Contract Carriers." (Opp. at 14.) Specifically, they assert, "[i]f Moreno's class is certified, Moreno's counsel must argue that some of their clients [i.e., drivers hired by carriers] were denied meal breaks, rest breaks, and minimum wage payments by their other clients [i.e., carriers that hired drivers]." (Id.) Further, Defendants argue a conflict exists because the carriers who signed Broker-Carrier Agreements "agreed to indemnify JCT for any liability arising from their provision of services under the agreement." (Id. (citing BCA ¶ 8).) Thus, according to Defendants, "if Moreno's counsel is successful in establishing liability for some of their clients – the Contract Carriers' drivers – they would simultaneously create liability for their other clients – the Contract Carriers that hired the drivers." (Id. at 15.)

Plaintiff points out that "Defendant's purported conflict would not apply to those persons falling within the Subclass' definition." (Reply at 14.) He also argues that no conflict exists as to the overall class because the claims arise out of JCT's conduct, not the actions of any carriers. (Id. at 15.) Thus, according to Plaintiff, the contract carriers would not be liable under California law or the indemnity provision. (Id. at 14–15.) Whether or not the carriers who hired drivers could be found liable, a conflict would exist if Defendants sought indemnification.[14] Nonetheless, "[t]he mere potential for a conflict of interest is not sufficient to defeat class certification; the conflict must be actual, not hypothetical." O'Shea v. Epson Am., Inc., 2011 WL 4352458, at *5 (C.D. Cal. Sept. 19, 2011), aff'd sub nom. Rogers v. Epson Am., Inc., 648 F. App'x 717 (9th Cir. 2016) (citing Cummings v. Connell, 316 F.3d 886, 896 (9th Cir. 2003) ("Mere speculation as to conflicts that may develop at the remedy stage is insufficient to support denial of initial class certification.")). The Court therefore concludes that Plaintiff and his counsel are adequate representatives.

For the foregoing reasons, the Court determines that Rule 23(a)'s requirements are satisfied as to the entire class.

//

---

[14] Defendants cite United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO, CLC v. ConocoPhillips Co., 2009 WL 734031, at *5 (C.D. Cal. Mar. 16, 2009, rev'd on other grounds, 593 F.3d 802 (9th Cir. 2010), in support of their argument that class counsel cannot adequately represent the interests of the class when a conflict exists. (Opp. at 15.) However, in that case an actual conflict existed because the defendant had already brought a counterclaim against the union plaintiff "alleging that [it] negotiated the shift schedule which Plaintiffs now challenge[d]." United Steel, 2009 WL 734031, at *5.

**5.  Rule 23(b) Requirements**

"In addition to satisfying Rule 23(a)'s prerequisites, parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3)." Amchem Prod., Inc. v. Windsor, 521 U.S. 591, 614 (1997).  Here, Plaintiff asserts the proposed class satisfies the requirements of Rule 23(b)(3) (Motion at 21), which requires (1) that issues common to the whole class predominate over individual issues and (2) that a class action be the superior method of adjudication, Fed. R. Civ. P. 23(b)(3).

**1.  Predominance**

The predominance "inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Hanlon, 150 F.3d at 1022 (quoting Amchem, 521 U.S. at 623).  Courts must consider "whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues. Tyson Foods, Inc. v. Bouaphakeo, 136 S. Ct. 1036, 1045 (2016).  "[T]he examination must rest on 'legal or factual questions that qualify each class member's case as a genuine controversy, questions that preexist any settlement.'" Hanlon, 150 F.3d at 1022 (quoting Amchem, 521 U.S. at 623).  A class should not be certified if the issues of the case require separate adjudication of each individual class member's claims. Id.

In order to satisfy Rule 23's predominance requirement, "plaintiffs must show that 'damages are capable of measurement on a classwide basis,' in the sense that the whole class suffered damages traceable to the same injurious course of conduct underlying the plaintiffs' legal theory." Just Film, 847 F.3d at 1120 (citing Comcast Corp. v. Behrend, 569 U.S. 27, 34–38 (2013)).  However, in assessing whether common issues predominate the analysis of state law claims, courts look to the elements of those claims as defined by state law. See Sali v. Corona Reg'l Med. Ctr., 889 F.3d 623, 638-39 (9th Cir. 2018); see also Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 809 (2011) ("Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action.").  Here, Plaintiff argues that common issues predominate as to the underlying misclassification issue and as to each claim.  (Motion at 21–27.)

**a.  Misclassification**

Plaintiff argues that "[c]ommon questions predominate with respect to each of Plaintiff's causes of action for which he seeks certification, as they are all predicated on the issue of misclassification." (Motion at 21.)  Plaintiff asserts that the ABC test is satisfied as to all class members.  (Id. at 22.)  Plaintiff also argues "JCT is Plaintiff's and class members' employer under the ICW wage orders if it controls the 'wages, hours, or working conditions' of the drivers," i.e., the first definition of "employ" articulated in Martinez.  (P. Supp. 2 at 2.)  Finally, Plaintiff contends that, even if the ABC test does not apply, common issues would nevertheless

---

predominate as to the misclassification issue under the common law test from *Borello*[.]" (Motion at 22.)[15]

Defendants argue that individual issues predominate with regard to misclassification because determination of employment status would require an individual analysis. (Opp. at 16.) They contend that the ABC test applies only to claims brought under IWC wage orders, while the <u>Borello</u> test applies to claims under the California Labor Code. (Opp. at 10 (citing <u>Garcia v. Border Transportation Group, LLC</u>, 28 Cal. App. 5th 558, 570–71 (2018)).) Plaintiff does not dispute this contention.

The Court finds it necessary to decide which tests apply to which claims to determine whether common questions predominate under those tests. The Court determines that any of the three definitions of "employ" articulated in <u>Martinez</u>, including the ABC test adopted in <u>Dynamex</u>, govern the wage order claims, while only <u>Borello</u> governs Plaintiff's statutory claims. The California Supreme Court in both <u>Martinez</u> and <u>Dynamex</u> interpreted the definitions of "employ" found in the IWC wage orders. <u>See</u> <u>Martinez</u>, 49 Cal. 4th at 64 ("As defined in the wage orders, '[e]mployer means any person . . . who . . . employs or exercises control over the wages, hours, or working conditions of any person,' and '[e]mploy means to engage, suffer, or permit to work.'") (quoting Wage Order No. 14, Cal. Code Regs., tit. 8, § 11140, subd. 2(C), (F)); <u>Dynamex</u>, 4 Cal. 5th at 913 ("Here we must decide what standard applies, under California law, in determining whether workers should be classified as employees or as independent contractors *for purposes of California wage orders*."). Thus, the IWC's definitions of "employ" do not extend to purely statutory claims. <u>See also</u> <u>Garcia</u>, 28 Cal. App. 5th at 570–71 (concluding that, under the logic of <u>Dynamex</u>, the "'suffer or permit to work' standard (and the ABC test that explicates it)" controlled wage order claims, while the <u>Borello</u> test controlled non-wage order claims).[16]

At the January 28, 2019 hearing, Plaintiff indicated that his rest break, meal break, and minimum wage claims depend on the wage orders. The Court therefore finds that the IWC's

---

[15] Though the <u>Martinez</u> court declined to decide whether the <u>Borello</u> test had any relevance to wage claims, 49 Cal. 4th at 73, both Plaintiff and Defendants assume the <u>Borello</u> standard is the same as <u>Martinez</u>'s third definition of "employ": "to engage, thereby creating a common law employment relationship," <u>see id.</u> at 64. (<u>See</u> P. Supp. 2 at 3; D. Supp. 2 at 3.) The Court therefore treats those two potentially distinct tests as one and the same for the purposes of this Motion.

[16] The Ninth Circuit's recent discussion of <u>Dynamex</u> in <u>Vazquez</u>, 2019 WL 1945001, supports the conclusion that <u>Dynamex</u> applies only to wage order claims. There, the court stated that "*Dynamex* . . . is about wage orders. There is no reason that the tests for employee status must necessarily be the same in wage order cases as in [other types of] cases." <u>Id.</u> at *15. In support of this reasoning, it quoted a portion of <u>Dynamex</u> emphasizing that the analysis of whether a worker is an employee or independent contractor "'focus[es] on the intended scope and purposes of the particular statutory provision at issue.'" <u>Id.</u> (quoting <u>Dynamex</u>, 4 Cal. 5th at 934).

---

**CIVIL MINUTES—GENERAL**   Initials of Deputy Clerk: <u>MG</u>

definitions of "employ," as developed in <u>Martinez</u> and <u>Dynamex</u>, apply to the meal break claim, rest break claim, minimum wage claim, and the UCL claims based on the foregoing.  The <u>Borello</u> test applies to the wage statement claim; the claim for failure to pay all wages owed every pay period; the business expenses claim; and the UCL claims based on the foregoing.  The Court considers whether common questions predominate the analysis under each test in turn.

### i.   "To exercise control over the wages, hours, or working conditions"

The "to exercise control" definition "encompasses 'any person . . . who directly or indirectly, or through an agent or any other person, employs or exercises control over the wages, hours, or working conditions of any person[.]'"  <u>Martinez</u>, 49 Cal. 4th at 71 (quoting Wage Order No. 14 (Cal. Code Regs., Tit. 8, § 11140, subd. 2(F)).  Plaintiff argues he "submitted evidence that JCT controlled each of these aspects of its drivers' work."  (P. Supp. 2 at 3.)  Defendants counter that "Plaintiff has wholly failed to demonstrate there is common, class-wide evidence that JCT controlled the wages, hours, or working conditions of the Drivers, or that JCT controlled the manner and means in which the Drivers performed the work."  (D. Supp. 2 at 5.)  Defendants also point out that "[s]ome Contract Carriers worked somewhat regularly," while others hauled loads very infrequently.  (<u>Id.</u> at 11.)  According to Defendants, "[s]uch 'limited interactions cannot constitute control for the purposes of an employer/employee relationship.'"  (<u>Id.</u> (quoting <u>Bright v. Dennis Garberg & Assocs.</u>, 2011 WL 13085923 at *5 (C.D. Cal. May 13, 2011) (applying the "exercise control over the wages, hours, or working conditions" definition).)  Plaintiff has provided little argument on this point, and the Court finds persuasive Defendants' argument that an individualized analysis would be necessary to determine the actual extent of control JCT exercised over the wages, hours, and working conditions of the drivers.  The Court therefore concludes Plaintiff has not established that common questions predominate the misclassification analysis under the first prong of the IWC's definition of "employ."

### ii.   "Suffer or Permit to Work" (ABC Test)

Plaintiff argues that "subsection 'B' of the ABC test [i.e., that the work performed is in the usual course of the hiring entity's business] is admittedly met" because Crowley "admitted that the proposed class of drivers are used 'in the usual course of JCT's business in brokering loads for its customers.'"  (<u>Id.</u> at 22 (quoting Crowley Depo at 49:1-7).)  Defendants do not advance arguments against predominance under the ABC test.

To establish that the class members were employees under the ABC test, it is sufficient for Plaintiff to show that the work performed by the class members was in the usual course of Defendants' business.  <u>See Dynamex</u>, 4 Cal. 5th at 956–57.  Because the type of work performed by the putative class members and the scope of Defendants' business are capable of determination on a classwide basis, the Court finds that common issues predominate under the ABC test.  <u>See Johnson</u>, 2018 WL 3646540 at *11 ("[W]hether Plaintiffs provide services within [defendant's] usual course of business is subject to common proof because [defendant] defines itself as a mortuary transportation service and all drivers perform the same work: mortuary

---

delivery services.  There is no evidence that [defendant] provides other services or that drivers are engaged in other kinds of work.").

### iii. <u>Borello</u> Test

Courts applying the <u>Borello</u> test must first assess the hiring entity's right to control the manner and means of accomplishing the work and then consider of a number of secondary factors.  48 Cal. 3d at 350–51.  "For purposes of class certification, the issue is whether these factors may be applied on a classwide basis, generating a classwide answer on the issue of employee status, or whether the determination requires too much individualized analysis." <u>Narayan v. EGL, Inc.</u>, 285 F.R.D. 473, 478 (N.D. Cal. Sept. 7, 2012).

Plaintiff asserts that "common issues would . . . predominate as to the misclassification issue under the common law test from *Borello*[.]"  (Motion at 22.)  However, Plaintiff advances no arguments and cites no cases in support of this assertion.  Defendants' arguments as to why individual questions predominate the misclassification issue appear to be based on the <u>Borello</u> test.  (<u>See</u> Opp. at 16–17.)  As to the test's primary inquiry, Defendants contend that "[t]he Broker/Carrier Agreement, which the Contract Carriers' drivers did not even sign, provided JCT with virtually no right of control over Contract Carriers' operations."  (<u>Id.</u> at 16.)  With regard to the first of the secondary factors enumerated in <u>Borello</u>, they argue that the "analysis of whether a class member operated a 'distinct occupation or business' will again turn on the individual business practices of each Contract Carrier, such as whether it hired drivers, owned multiple trucks, or simultaneously worked for other businesses."  (<u>Id.</u> at 17.)  Plaintiff does not address these arguments in his Reply.  The Court therefore finds that Plaintiff has failed to carry his burden to show that common questions predominate the misclassification analysis under <u>Borello</u>.

Because Plaintiff has not shown that common questions predominate the <u>Borello</u> misclassification analysis, which is a necessary predicate to Plaintiff's statutory claims, the Court cannot find that common questions predominate as to those claims, i.e., the wage statement claim, the claim for failure to pay all wages owed every pay period, the business expenses claim, and the UCL claims based on the foregoing.  <u>See</u> <u>Martinez v. Flower Foods, Inc.</u>, 2016 WL 10746664, at *13 (C.D. Cal. Feb. 1, 2016) ("[R]egardless of how the Court answers the predominance question in the context of the wage-and-hour claims, individualized issues will invariably exist as to Plaintiffs' threshold misclassification claim, rendering the entire case unsuitable for class certification.")  The Court therefore addresses only whether common issues predominate the claims governed by the ABC test, i.e., the minimum wage claim, the rest break claim, the meal break claim, and the UCL claims based on the foregoing.

### b.  Minimum Wage Claim

Plaintiff's minimum wage claim rests on the argument that Defendants' per-load pay structure constitutes payment on a piece-rate basis, which, under California law, must be accompanied by payment for non-productive time.  (Motion at 22–23.)  Plaintiff contends that

"[c]ommon issues predominate as to the claim that Defendant fails to pay minimum wages to the Class for non-driving time." (Motion at 23.)  In support of his argument, Plaintiff cites <u>Cardenas v. McLane Foodservices, Inc.</u>, a federal district court case that applied California labor law to truck drivers paid on a piece-rate basis, holding that "a piece-rate formula that does not compensate directly for all time worked does not comply with California Labor Codes, even if, averaged out, it would pay at least minimum wage for all hours worked." (<u>Id.</u> (quoting 796 F. Supp. 2d 1246, 1252 (C.D. Cal. 2011).)

Defendants argue that "Moreno has failed to designate common, class-wide evidence that the proposed class received less than the minimum wage in any given hour of work." (<u>Id.</u> at 18.) According to Defendants, "[t]o determine liability in this case, the Court would need to determine, in any hour a driver performed 'non-productive' work, the amount paid for the 'productive' work that was also performed in that hour." (<u>Id.</u> at 18–19.)  However, this argument depends on the assumption that remuneration for productive and non-productive time must be averaged out.  That assumption is undermined by the <u>Cardenas</u> opinion, 796 F. Supp. 2d 1246, and Defendants cite no contrary authority.  The Court finds the <u>Cardenas</u> court's analysis persuasive and therefore determines that, in order to show a minimum wage claim violation under California law, Plaintiff must show that Defendants paid drivers on a piece-rate basis that did not compensate for nonproductive time.  <u>See</u> 796 F. Supp. 2d at 1252.  He need not show that the amount paid to each driver averaged out to more than minimum wage.  <u>See id.</u>  For the purpose of assessing predominance, it is unnecessary for the Court to determine whether Defendants' payment plan constituted a piece-rate pay formula or whether it compensated for nonproductive time.  It need only determine that the same policies bearing on these questions were applied to all class members.

Defendants argue that "class certification is not appropriate on wage-and-hour claims when the defendant does not have a standard policy of violating California law that applied to all class members." (Opp. at 17 (citing <u>Ortega v. J.B. Hunt Transport, Inc.</u>, No. 2:07-cv-08336, slip op. 4-6 (C. D. Cal. Aug. 7, 2018).)  Here, they assert, there was no such common pay policy because "JCT paid Contract Carriers different amounts for each load, based on negotiation with the Contract Carriers" and the carriers may have had their own payment policies for the drivers they hired. (<u>Id.</u> at 17–18.)  Plaintiff responds by pointing to evidence of a pay policy common to all contract carriers. (Reply at 18.)  Specifically, Plaintiff claims that "JCT does not compensate drivers time spent waiting for loading unless those times exceeded 4 hours[,] and loading generally took between two and four hours per load." (<u>Id.</u> (citing Moreno Decl. ¶ 4; Crowley Depo at 113:8-13, 114:21 – 115:1; Yousuf Depo at 48:4-7, 49:22–50:2, 52:6-9).)  He also cites evidence that Defendant "does not pay for time spent carrying out pre-trip and post-trip truck inspections." (<u>Id.</u> (citing Yousuf Depo at 52:6-12).)

That Defendants paid different amounts to different carriers does not undermine the existence of a common policy regarding payment for nonproductive time.  Plaintiff has furnished sufficient evidence of the existence of common policies applicable to all drivers hired by Defendants.  However, the Court agrees with Defendants that Plaintiff has not shown that those policies applied to the drivers hired by carriers.  As Defendants point out, those drivers may have

been paid on an hourly basis and they may have been paid for nonproductive time by the carriers that hired them. In order to determine whether those drivers suffered damages resulting from Defendants' pay policies, the Court would need to conduct individualized inquiries into how they were paid by the carriers who hired them. Thus, Plaintiff has not shown that he can establish on a classwide basis that the drivers "suffered damages traceable to the same injurious course of conduct underlying the plaintiffs' legal theory." See Just Film, 847 F.3d at 1120. Consequently, the Court finds that common issues predominate the analysis of the minimum wage claim only as to the subclass of drivers who contracted directly with Defendants.[17]

### c. Rest Break Claim

Plaintiff argues that common issues predominate as to the rest break claim because Defendants applied "'a piece-rate compensation formula that does not compensate separately for rest periods'" in violation of California law. (Motion at 24 (quoting Bluford v. Safeway Stores,

---

[17] Plaintiff contends that it is Defendants' burden to provide evidence that carriers actually had their own employment policies as to the drivers they hired. (P. Supp. 2 at 7–8.) In support of that argument, Plaintiff cites a California Court of Appeals case, Benton v. Telecom Network Specialists, Inc., which held in relevant part that "the mere fact that [the defendant's] coemployer entities had diverse meal and rest break policies in place during the class period was not, standing alone, a proper basis for denying certification of plaintiffs' meal and rest break claims against [the defendant]." 220 Cal. App. 4th 701, 730 (2013). In reaching this conclusion, the court considered that the language of the Wage Order imposed liability on employers for failure to authorize and provide legally required meal and rest breaks. Id. at 728. Thus, Plaintiff argues, "under California substantive law relating to joint employment, even if JCT could show that class members had another joint employer, those potential joint employers would not be liable for Labor Code violations committed by JCT." (P. Supp. 2 at 8.) However, the issue here is not which employer is liable, but whether Plaintiff can show on a classwide basis that drivers suffered injury. If the carriers who hired drivers paid them for nonproductive time, then they suffered no harm as a result of Defendants' "piece-rate" pay scheme.

Nonetheless, if California law does not require a showing of harm, but is satisfied by a showing of violative conduct, Plaintiff need not demonstrate harm on a classwide basis. See Sali v. Corona Reg'l Med. Ctr., 889 F.3d 623, 638-39 (9th Cir. 2018) ("The district court erred by concluding that damages for members of the wage statement class would require an individualized determination. Because the Code specifies that a violation of § 226 is a per se injury, there is no individualized issue of damages."). However, Benton did not involve a minimum wage claim, and Plaintiff does not argue that no showing of harm is required to establish a minimum wage violation under California labor law. Rather, under the California Labor Code, "an employee receiving less than the legal minimum wage . . . is entitled to recover in a civil action the unpaid balance[.]" Cal. Lab. Code § 1194 (emphasis added). Thus, the Court considers whether Plaintiff can show on a classwide basis that the drivers "receiv[ed] less than the legal minimum wage[.]" See id. Because he cannot, the minimum wage claim class is limited to the subclass of drivers hired directly by Defendants.

---

<u>Inc.</u>, 216 Cal. App. 4th 864, 872 (2013))(citing Crowley Depo at 113:15-19; Yousuf Depo at 50:4-7; Moreno Decl. ¶5.))  Defendants argue that "Moreno has failed to advance common, class-wide evidence that JCT uniformly deprived the class of [meal and rest] breaks."[18]  (Opp. at 19.)  According to Defendants, such evidence is necessary because, under California law, an employer is liable for missed breaks only if it "impede[s], discourage[s], or prohibit[s]" employees from taking breaks.  (<u>Id.</u> at 20 (quoting <u>Washington v. Joe's Crab Shack</u>, 271 F.R.D. 629, 641 (N.D. Cal. 2010)).)  As Plaintiff points out, his rest break claim, at least as articulated in the Motion, is "based on the failure to pay for rest breaks, <u>not</u> the failure to take them."[19]  (Reply at 16.)  Defendants put forth no argument against the existence of a common policy regarding payment for rest breaks.

Defendants do, however, argue that Moreno has not shown that the class members were entitled to meal and rest breaks.  (Opp. at 21.)  Under Wage Order No. 9-2001(12)(A), a ten-minute rest period is required for every four hours worked.  According to Defendant, "Moreno has failed to demonstrate that *any* absent class member, let alone all of them, worked long enough to trigger any potential liability for missed meal and rest breaks."  (Opp. at 22.)  Plaintiff responds by pointing to evidence that "many shifts exceeded 3 ½ hours[,]" including testimony by Mr. Yousuf that all but one route JCT gives its drivers take longer than 3.5 hours.  (Reply at 16 (citing Yousuf Depo II at 51:6-22).)  While it may be the case that some shifts were too short to trigger any obligation to provide or compensate for rest breaks, the Court finds that common questions predominate with regard to the rest break claim.  Plaintiff has presented sufficient evidence that a common policy regarding remuneration for rest breaks applies to carriers.  Further, the length of shifts, while varied, should be fairly easy to ascertain on a subclass-wide basis, for example, from testimony of JCT personnel on the standard length of time taken to drive the available routes and JCT's records on which carriers drove which routes.  However, the Court finds that Plaintiff has not shown that common questions predominate with regard to drivers hired by carriers because those carriers may have had their own pay policies which remunerated drivers for rest time.[20]

---

[18] In their Opposition, Defendants address meal and rest breaks together.  (Opp. at 19–22.)  Because Plaintiff advances different arguments with regard to meal and rest breaks, the Court considers them separately.

[19] The Court notes that the FAC alleges both a failure to compensate for rest breaks and a failure to provide or authorize rest breaks.  (FAC ¶¶ 42, 43.)  Because Plaintiff does not advance any argument regarding failure to provide or authorize rest breaks in the Motion, he has not met his burden to establish that common questions predominate as to such a claim.

[20] Unlike the rest break claim in <u>Benton</u>, Plaintiff's rest break claim – at least as far as developed in the Motion – does not involve an alleged failure to "authorize and provide" rest breaks, but failure to pay drivers for rest breaks.  (<u>See</u> Reply at 16.)  <u>See</u> <u>Benton</u>, 220 Cal. App. 4th at 728-29.  Thus, the <u>Benton</u> court's finding that an employer is liable if it fails to satisfy its "affirmative obligation . . . to authorize and provide legally required meal and rest breaks" does

---

### d.  Meal Break Claim

Plaintiff argues that common issues predominate as to the meal break claim because the strict schedules imposed by Defendants "created an incentive for drivers to skip meal breaks" and because Defendants "pay[] no compensation for missed or untimely meal breaks."  (Motion at 25 (citing Moreno Decl. ¶ 5; Yousuf Depo at 50:8-10).)  Plaintiff contends that "[a] scheduling policy that does not permit drivers to 'complete their work on time' without skipping meal breaks is a common issue appropriate for class certification."  (Id. (citing Rodriguez v. Cleansource, Inc., 2015 WL 5007815, at *6 (S.D. Cal. Aug. 20, 2015)[21].)  Plaintiff asserts that he "has presented class-wide evidence that Defendant only paid on a piece rate, with a strict schedule that drivers were required to meet."  (Reply at 17 (citing Crowley Depo at 50:14-20, 120:12–121:7, 150:13-19).)

The issue of whether the schedules imposed on drivers permitted them to take meal breaks can be addressed on a classwide basis, for example, from testimony of JCT personnel regarding the schedules assigned for each route.  Similar evidence can be used to ascertain whether drivers were entitled to meal breaks, that is, whether their shifts were long enough for the Wage Order's meal break requirement to apply.  See IWC Order No. 9-2001(11)(A) ("No employer shall employ any person for a work period of more than five (5) hours without a meal period of not less than 30 minutes, except that when a work period of not more than six (6) hours will complete the day's work the meal period may be waived by mutual consent of the employer and the employee.").  If the schedules assigned for particular routes were so tight that the driver could not take meal breaks, Defendants effectively denied breaks to the drivers, regardless of any meal break policies carriers might have established for drivers they hired.  Thus, questions common to the entire class predominate the meal break claim.

### e.  UCL Claim

"California's unfair competition law (UCL) . . . defines 'unfair competition' to mean and include 'any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [the false advertising law (§ 17500 et seq.)].'"  Kasky v. Nike, Inc., 27 Cal. 4th 939, 949 (2002) (quoting Cal. Bus. & Prof. Code § 17200).  "By defining unfair competition to include any '*unlawful* . . . business act or practice', the UCL permits violations of other laws to be treated as unfair competition that is independently

---

not mean that Plaintiff need not show on a classwide basis that the drivers were not paid for rest breaks.  See id. at 728.

[21] In Rodriguez, the court denied a motion to dismiss a claim for failure to provide meal and rest breaks because the plaintiffs had alleged "that Defendants' business model was based on assigning non-exempt employees too much work that could not be finished in a normal shift, that Plaintiffs feared losing their jobs if they did not complete their work on time, and were thus compelled to skip meal or rest periods."  2015 WL 5007815 at *6.

actionable." <u>Id.</u> (citations omitted).  In this action, Plaintiff seeks "restitutionary disgorgement" and injunctive relief (FAC ¶ 81) relating to Defendants' alleged unfair and unlawful conduct, which includes "violating the statutes alleged" in the FAC, "fail[ing] to pay Class members wages and compensation they earned through labor provided, and failing to otherwise compensate Class members[.]" (<u>id.</u> ¶ 79).[22]

Plaintiff argues that the entire class should be certified at least as to the UCL cause of action because "[t]he California Supreme Court has established that, as to unnamed class members, 'relief under the UCL is available ***without*** individualized proof of . . . injury.'" (P. Supp. 2 at 7 (quoting <u>In re Tobacco II Cases</u>, 46 Cal. 4th 298, 320 (2009) ("<u>Tobacco II</u>") (Plaintiff's emphasis).)  Defendants counter that "[t]here is no exception in [*Wal-mart v.*] *Dukes* for the certification of UCL claims under Rule 23." (D. Supp. 2 at 7 n. 4.)  <u>Tobacco II</u> affirmed that the fraudulent business practice prong of the UCL – as distinct from common law fraud – does not require a showing of reliance.  46 Cal. 4th at 312.  In <u>Stearns v. Ticketmaster Corp.</u>, the Ninth Circuit, relying on <u>Tobacco II</u>, overturned a district court decision that denied class certification on a UCL claim on the basis that "individualized proof of reliance and causation would be required."  655 F.3d 1013, 1020-21 (9th Cir. 2011).[23]  Because no such proof of reliance was required under the UCL, the Ninth Circuit concluded that the district court erred in denying certification on that basis.  <u>Id.</u>  Thus, Plaintiff's argument does not, as Defendants contend, urge the Court to apply an "exception" to the requirements of Rule 23.  Rather, it properly asks the Court to consider the elements of the underlying cause of action in applying the predominance standard.  <u>See</u> <u>Halliburton</u>, 563 U.S. at 809.

However, Plaintiff cites no case indicating that causation and harm are not necessary elements of a claim under the "unfair" or "unlawful" prongs of the UCL.  Consequently, he has not established that common issues predominate the UCL claims as to the entire class, independent of the predominance analysis applicable to their predicate claims.

In summary, the Court finds that issues common to the class predominate the misclassification analysis under the ABC test.  Because Plaintiff has not met his burden to establish that common issues predominate under the <u>Borello</u> analysis, he has also failed to show

---

[22] Plaintiff's UCL claim also seeks relief for "fraudulent conduct[, which] includes . . . issuing wage statements containing false and/or misleading information[.]"  (FAC ¶ 79.)  However, because the inaccurate wage statement claim is brought under Labor Code, and is therefore governed by the <u>Borello</u> test, the UCL claim based on that claim is also governed by <u>Borello</u>.  <u>See</u> <u>Garcia</u>, 28 Cal. App. 5th at 571-72 ("[T]he wage order does not encompass claims for wrongful termination in violation of public policy or waiting time penalties.  Accordingly, Garcia's claims for overtime, wrongful termination, waiting time penalties, and UCL claims resting on the foregoing are governed by the common law test articulated in *Borello*.").  Because the Court has determined that individual issues predominate the <u>Borello</u> analysis, individual issues necessarily predominate the claim under the "fraudulent" prong of the UCL.

[23] In so doing, the Ninth Circuit noted that it "[did] not, of course, suggest that predominance would be shown in every California UCL case."  <u>Id.</u> at 1020.

---

that common issues predominate the statutory claims.  Of the remaining claims, issues common to the entire class predominate the meal break claim.  However, issues common only to the subclass predominate the minimum wage and rest break claims.  The UCL claims based on these claims satisfy the predominance standard to the same extent as the underlying claims.

### 2. Superiority

A class action must also be superior to other methods of adjudication for resolving the controversy.  Fed. R. Civ. P. 23(b)(3).  To determine superiority, a court's inquiry is guided by the following pertinent factors:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)-(D).

Plaintiff argues a class action is superior to individual adjudication because "the alternative to a class case [in the employment context] is often no case at all" because of workers' "'fear of economic retaliation[.]'"  (Motion at 29 (quoting Rutti v. Lojack Corp., 2012 WL 3151077, at *6 (C.D. Cal. July 31, 2012)).)  He also stresses that a class action will not present manageability problems because of the class-wide evidence, as to both liability and damages.[24] (Id. at 29–30.)  He concludes that "[t]he straightforward relief sought (wage calculations), and the evidence regarding the same, is markedly less complicated than many other class actions that have been deemed manageable."  (Id. at 30.)

Defendants contend the proposed class is unmanageable because JCT does not consistently collect the names and contact information of drivers hired by carriers.  (Opp. at 24.)  Even if the action were limited to the subclass, Defendants argue, class adjudication is not superior because "Plaintiff offers no evidence or method to identify whether those owners ever personally operated a truck, a precursor to class membership, or hired others to drive their truck(s)."  (D. Supp. 2 at 10.)  As Plaintiff points out, the Ninth Circuit has held that "the

---

[24] Plaintiff contends that damages "can be proven through JCT's records, presentation of expert testimony and data, as well as class member testimony."  (Motion at 29.)  Specifically, he points out that "[t]he settlement statements issued for each load reflect the pick up and delivery time, and the amount of miles travelled."  (Id.)  According to Plaintiff, "[t]his documentary evidence can be used to calculate the number of non-driving hours worked, as well as the qualifying shifts for rest (exceeding 3.5 hours) and meal breaks (exceeding 5 hours)."  (Id.)

language of Rule 23 neither provides nor implies that demonstrating an administratively feasible way to identify class members is a prerequisite to class certification[.]" (<u>See</u> Reply at 7.) <u>See</u> <u>Briseno</u>, 844 F.3d at 1133.[25]  The Court therefore declines to find the action unmanageable on this basis.[26]

Defendants also assert that "the Court would need to solicit individual testimony from class members about when they worked, how and what they were paid, how long they worked, whether they took breaks, and, if not, whether JCT prevented them from doing so." (Opp. at 25.)  In their 2nd Supplemental Brief, Defendants further highlight the differences among putative class members and argue that "Plaintiff has made no attempt to show that the classification of these drivers can be successfully litigated on the basis of classwide evidence." (D. Supp. 2 at 11.)  The Court has already addressed under its predominance analysis whether Plaintiff's claims are susceptible of classwide proof.  The action, limited to the claims and theories under which common issues predominate, presents no manageability problems that would make a class action inferior to separate individual actions.  The Court therefore finds Rule 23(b)(3)'s superiority requirement satisfied.

## IV.   THE UPDATED BROKER/CARRIER AGREEMENT

After filing their Opposition, Defendants' counsel discovered an updated version of the Broker-Carrier Agreement, which they provided to Plaintiff on December 19, 2018.  (Mod Stip ¶ 3.)  The parties then stipulated that Defendants would file a supplemental declaration to introduce the updated BCA and both parties would file supplemental briefs addressing the new issues raised by the discovery of the document.  (<u>Id.</u> ¶ 5; <u>see also</u> Order Granting Stipulation.)  Defendants' 1st Supplemental Brief was accompanied by the declaration of Shannon Crowley

---

[25] Defendants assert that, based on <u>Briseno</u>, "courts have denied class certification when class members cannot be identified." (<u>Id.</u> at 25 (citing <u>Urena v. Earthgrains Distribution, LLC</u>, 2017 WL 4786106, at *10 (C.D. Cal. July 19, 2017); <u>In re SFPP Right-of-Way Claims</u>, 2017 WL 2378363, at *13–18 (C.D. Cal. May 23, 2017).)  Defendants state that the Ninth Circuit in <u>Briseno</u> "noted a separate ascertainability requirement is unnecessary because 'Rule 23(b)(3) already contains a specific, enumerated mechanism to achieve that goal: the manageability criterion of the superiority requirement.'" (Opp. at 24 (quoting <u>Briseno</u>, 844 F.3d at 1127).)  However, the Ninth Circuit did not state that all elements considered by other circuits under "ascertainability" are subsumed in the manageability analysis.  Rather, the <u>Briseno</u> panel indicated that some such factors are addressed in the Ninth Circuit "through analysis of Rule 23's enumerated requirements," <u>id.</u> at 1124 n. 4, but concluded that Rule 23 <u>does not</u> contain a requirement that plaintiffs "demonstrat[e] an administratively feasible way to identify class members," <u>id.</u> at 1133.  Thus, <u>Briseno</u> does not support the denial of class certification on the basis that it might be difficult to identify class members.

[26] Moreover, Plaintiff points to evidence contradicting Defendants' assertion that they did not maintain records of the drivers hired by carriers.  (<u>See</u> Reply at 7 (citing Yousuf Depo at 10:22–11:6, 12:7–13).)

---

**CIVIL MINUTES—GENERAL**            Initials of Deputy Clerk:  <u>MG</u>

("Crowley Decl.," Dkt. No. 53-1 at 2). Attached to the Crowley Declaration was a copy of the new version of the BCA. ("Updated BCA," Dkt. No 53-1 at 4–14.[27])

In their 1st Supplemental Brief, Defendants explain that they recently discovered that "JCT began using an updated version of its Broker/Carrier Agreement in early 2018 for new Contract Carriers and as a replacement contract when existing Contract Carriers' information is updated."[28] (D. Supp. 1 at 1.) Approximately 190 carriers have signed the Updated BCA, a number Defendants note will increase. (Id.) Defendants highlight three differences between the original BCA and the Updated BCA: the required notice period for either party to terminate the contract was increased from ten to thirty days, the language of the indemnification provision was changed, and the Updated BCA contains a broader forum-selection clause.[29] (Id. at 2–3.) Because the Court has already determined that some of Plaintiff's claims do not meet the

---

[27] Here, because Dkt. No. 53-1 includes both the Crowley Declaration and the Updated BCA, which have distinct pagination, the Court refers to the page numbers contained in the heading generated by the Electronic Case File ("ECF") system. Hereinafter, when citing documents within Dkt. No. 53-1, the Court will refer to the page numbers of the specific document.

[28] Plaintiff argues that "Defendant improperly failed to produce the new contract in response to discovery," and that the Updated BCA should therefore not be considered. (P. Supp. at 1.) However, Plaintiff cites no authority in support of his argument. Because discovery is still ongoing and there is no indication that Defendants purposefully withheld the document or delayed in notifying Plaintiff about it, the Court finds it appropriate to consider the Updated BCA in deciding this Motion.

[29] The original forum-selection clause read: "This written Agreement, together with any load confirmation, contains the entire agreement between the parties and may only be modified by signed written agreement. Oklahoma law, venue, and jurisdiction shall apply." (BCA ¶ 9.) The Court determined that this clause was "insufficient to bind the parties to litigate this dispute in the Northern District of Oklahoma" because "it lacked language defining its scope[.]" (MTR/MTT Order at 8.) The new forum-selection clause reads:

> This Agreement shall be interpreted in accordance with, and governed by, the laws of the United States and, of the State of Oklahoma, without regard to the choice-of-law rules of Oklahoma or any other jurisdiction. THE PARTIES AGREE THAT ANY CLAIM OR DISPUTE ARISING FROM OR IN CONNECTION WITH THIS AGREEMENT, WHETHER ASSERTING A CLAIM UNDER FEDERAL, STATE, LOCAL, OR FOREIGN LAW SHALL BE BROUGHT EXCLUSIVELY IN THE STATE OR FEDERAL COURTS SERVING CREEK COUNTY, OKLAHOMA. CARRIER AND BROKER HEREBY CONSENT TO THE JURISDICTION AND VENUE OF SUCH COURTS.

(Updated BCA ¶ 19.)

---

requirements of Rule 23, the Court considers only the extent to which the new agreement affects the remaining claims as limited by the predominance analysis.

Defendants, focusing primarily on the Borello test, argue that the misclassification analysis will be complicated by the existence of the Updated BCA and that Plaintiff is not typical of class members who signed the Updated BCA.  (Id. at 1–2.)  As Plaintiffs point out, "the new agreement . . . has no impact [as to the ABC test]; drivers either are or are not operating in Defendant's usual course of business."  (P. Supp. 1 at 2.)  Nor is the Court convinced that the fact that some drivers signed a somewhat different contract, by itself, is enough to destroy typicality.  As to the specific provisions Defendants highlight, the Court finds that none of them affect "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiff, [or] whether other class members have been injured by the same course of conduct."  See Just Film, 847 F.3d at 1116.

As to the longer notice period for termination of the contract, Defendants have not explained what claim it relates to or how it might alter the Court's consideration of the Rule 23 factors.  Plaintiff asserts that the longer notice period is "not a material difference" (P. Supp. 1 at 3), and the Court sees no reason to conclude otherwise.

Defendants also argue that "[t]he Contract Carriers' indemnification obligation under the updated Broker/Carrier Agreement . . . drives home the conflict of interest that should disqualify Plaintiff's counsel from representing both groups."  (D. Supp. 1 at 3.)  However, the modifications to the indemnification provision do not change the fact that Defendants have identified only a potential – not actual – conflict, which is insufficient to defeat class certification. See O'Shea, 2011 WL 4352458, at *5.

Finally, Defendants contend the putative class members who signed the new agreement should be excluded from the class because the updated forum-selection clause is "similar to clauses courts have previously enforced."  (D. Supp. 1 at 3.)  However, Defendants advance no arguments as to how the new forum-selection clause, if enforceable, might affect the Court's Rule 23 analysis.  See Jimenez v. Allstate Indem. Co., 2010 WL 3623176, at *3–4 (E.D. Mich. Sept. 15, 2010) (declining to limit the class on the basis of a forum-selection clause that arguably prevented certain putative class members from joining the action where defendant "[did] not address any of the Rule 23 prerequisites in its papers, leaving the Court unable to determine exactly how the forum selection clause argument fit[] into the Rule 23 analysis and ma[de] certification improvident"), on reconsideration in part, 765 F. Supp. 2d 986 (E.D. Mich. 2011). Nor do they express an intent to enforce the new forum-selection clause.  See In re Titanium Dioxide Antitrust Litig., 284 F.R.D. 328, 350 (D. Md. 2012) (concluding that "the possible arbitration or other contractual bar of some class members does not, by itself, defeat class certification" where defendants raised the issue that "many members of the putative class entered into contracts with Defendants that contain[ed] mandatory arbitration provisions, forum-selection clauses, and jury waiver provisions," but "[n]either party briefed th[o]se issues extensively" and "it [was] unclear . . . to what extent the Defendants [would] seek to uphold those agreements") (cleaned up), as amended, 962 F. Supp. 2d 840 (D. Md. 2013).  The Court

therefore finds that the potential enforceability of a distinct forum-selection clause as to some class members does not defeat class certification or justify limiting the class to those who signed the original BCA.

## V.    CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART Plaintiff's Motion and CERTIFIES the entire class as to the meal period claim and the subclass as to the minimum wage and rest period claims.

**IT IS SO ORDERED.**

**CIVIL MINUTES—GENERAL**          Initials of Deputy Clerk: <u>MG</u>